**McCULLOCH GAS PROCESSING CORPORATION, Plaintiff-Appellee,**

v.

**DEPARTMENT OF ENERGY, Gordon E. Singer, Area Manager for Wyoming, Region VIII, Department of Energy and the United States of America, and James R. Schlesinger, Secretary, Department of Energy, Defendants-Appellants.**

No. 10–24.

Temporary Emergency Court of Appeals.

Argued Nov. 12, 1980.

Decided March 3, 1981.

As Amended on Denial of Rehearing May 12, 1981.

Don W. Crockett, Dept. of Energy, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Dept. of Justice, and Sandra K. Webb, Dept. of Energy, Washington, D. C., were on brief, for defendants-appellants.

Richard D. Ahern, Richard T. Williams, Kadison, Pfaelzer, Woodward, Quinn & Rossi, Los Angeles, Cal., with whom Don G. Kircher and Franklin D. Dodge, of McCulloch Gas Processing Corp., Los Angeles, Cal., and Jack B. Speight, of Hathaway, Speight & Kunz, Cheyenne, Wyo., were on brief, for plaintiff-appellee.

Before CHRISTENSEN, JAMESON and DUNIWAY, Judges.

JAMESON, Judge.

The Department of Energy (DOE) has appealed from portions of a judgment of the district court, 498 F.Supp. 194, holding invalid certain amendments to Subpart K of the Mandatory Petroleum Price Regulations, 10 C.F.R. § 212.161 *et seq.*, governing the passthrough of increased non-product costs by natural gas processors. The district court also remanded for further consideration two decisions of the DOE denying exception relief for McCulloch Gas Processing Corporation. The DOE does not challenge the remand of the exception proceedings.

## I FACTUAL BACKGROUND

McCulloch Gas Processing Corporation (McCulloch) is a wholly-owned subsidiary of McCulloch Oil Corp. (McCulloch Oil). Together with two other McCulloch Oil subsidiaries, McCulloch Interstate Gas Corporation and McCulloch Gas Transmission Company, McCulloch is engaged in the production and sale of natural gas, natural gas liquids (NGL) and natural gas liquid products (NGLP).[1] McCulloch processes natural

---

1. The regulations (10 C.F.R. § 212.162) distinguish NGL from NGLP. NGL means a mixture of ethane, butane, propane, and natural gas. NGLP refers to the separate products derived

gas to extract various liquids, such as propane and butane, for sale to commercial and residential customers. McCulloch also sells residue gas, primarily to one of its sister corporations. McCulloch owns all or part of eight gas processing plants in Wyoming, South Dakota, and Montana.

The DOE has the authority and responsibility to promulgate and administer price regulations of petroleum products under the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 et seq. (EPAA). Subpart K of the regulations, 10 C.F.R. § 212.161 et seq., governs the allocation and prices of NGLP. The basic scheme of these regulations resembles the general price rules for other petroleum products. The price for NGLP is limited to the price in effect on May 15, 1973, plus adjustments to reflect the increased cost of gas (product cost) and the increased costs of processing and marketing the gas (non-product costs). Because of the peculiar characteristics of the natural gas processing industry, however, certain differences in Subpart K were developed, as discussed below.

McCulloch applied to the Federal Energy Administration (FEA), DOE's predecessor, for exception relief from the application of the regulations to its eight processing plants, to permit a passthrough of certain non-product costs, including increased depreciation costs and amortization payments on loans.[2] The FEA granted partial relief, but denied passthrough of the depreciation and amortization payments, consistent with prior holdings that depreciation did not represent an actual out of pocket cost, and amortization payments were capital transactions (as opposed to expenses), so neither could be considered in calculating an allowable price increase under the regulations.

McCulloch also sought exception relief for its plant at Belle Fourche, South Dako-

ta. The DOE had issued a Notice of Probable Violation (NOPV) to McCulloch which questioned its price computations under the regulations. Based on the DOE's regulation as set forth in the NOPV, McCulloch decided that it could not operate the plant profitably and suspend operations. McCulloch then filed for exception relief to permit a higher sales price for NGLP produced at the Belle Fourche plant than would otherwise be permissible. Relief was denied on the ground that the plant could be operated profitably without a deduction for depreciation. This denial was upheld by the Federal Energy Regulatory Commission (FERC), which applied the new Subpart K regulations and concluded that McCulloch had not sustained a serious hardship or gross inequity.[3] So far as the record shows, the Belle Fourche plant remains closed.

McCulloch brought this action seeking review of the two exception proceedings. In an amended complaint it also challenged the validity of amendments to Subpart K which became effective November 1, 1978, contending that the regulations governing the passthrough of increased depreciation expense, general and administrative expenses, interest, and gathering expenses were arbitrary and capricious and without rational basis. It also questioned the adequacy of the notice of the proposed regulations in light of the final regulations that were adopted. The defendants moved for summary judgment. Following discovery and a two-day hearing, the district court entered its memorandum decision sustaining most of McCulloch's contentions.

The district court first concluded that the DOE had failed to give sufficient consideration to McCulloch's two requests for exception relief, noting that the DOE had made no findings with regard to McCulloch's cash flow, net profit, or return on invested capi-

---

from NGL (except for ethane). The distinction is not important for purposes of this case, so the single designation NGLP will be used for simplicity.

2. McCulloch had financed construction of its plants by borrowing both from its parent company and from independent third parties.

3. 10 C.F.R. § 205.55(b)(2) prescribes the standard of review for an exception:

> An application for exception relief may be granted to alleviate or prevent serious hardship or gross inequity.

tal. The court remanded both cases for additional consideration in light of this court's decision in *Twin City Barge & Towing Corp. v. Schlesinger*, 603 F.2d 197 (Em. App.1979). The DOE does not challenge the remand of the exception proceedings.

With respect to the challenged amendments to Subpart K, the court held that the "revisions . . . regarding the definition of gas plants, depreciation expense, general and administrative expenses and interest expense are arbitrary and capricious, lacking in substantial evidence and without rational basis." The court held further that the regulation governing passthrough of increased depreciation expense was procedurally defective. A judgment was entered that specified "words" of the revisions "as applied to plaintiff McCulloch are null and void and of no force and effect." The DOE appeals from the portions of the judgment invalidating the regulatory amendments.

## II   REGULATORY BACKGROUND

NGLP have been the subject of price control since 1973, when, pursuant to Section 203 of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904 note, the Cost of Living Council adopted regulations applicable to the petroleum industry. Following the passage of the Emergency Petroleum Allocation Act of 1973, the FEA, in regulations adopted effective January 15, 1974, left the price structure established by the Cost of Living Council essentially intact.

When it became apparent that the refiner price regulations were not well suited to the problems of gas processors, the FEA on December 19, 1974, promulgated separate regulations to deal specifically with the prices of NGLP processed in gas plants. These regulations, designated as Subpart K, became effective January 1, 1975.

The 1975 regulations authorized automatic passthrough of increased non-product costs up to one-half cent per gallon of NGLP. This was not designed as an absolute limit, but rather reflected the agency's judgment of the extent to which gas processing firms should be permitted automatically to pass through these costs. Firms incurring costs in excess of the one-half cent limit could request authorization to charge higher prices under the agency's policy of granting exception relief to any plant that could demonstrate that its non-product costs had increased substantially more than one-half cent per gallon. The agency did not as a general rule, however, allow increases in depreciation costs per gallon of NGLP to be passed through, especially where the "increase" in depreciation cost was attributable to a decline in production (i. e., the amount of depreciation remained constant, but because of lower production the depreciation cost per gallon increased).

On June 3, 1977, the FEA, recognizing that the case-by-case exception review of gas processors' non-product increases had become burdensome, initiated a comprehensive rulemaking procedure. It proposed to revise Subpart K to provide, *inter alia*, for more specific rules to govern the passthrough of non-product costs. A public hearing was held, at which oral testimony was presented. Written comments were received from other interested parties, including McCulloch. On September 14, 1978, the DOE issued amended regulations.

The amended regulations which are at issue in this case allow the passthrough of (a) depreciation expenses, subject to the provision that depreciation cost increases subsequent to October 31, 1978, must be calculated on a units-of-production basis,[4] regardless of the method actually used during the base period (10 C.F.R. § 212.-165(b)(2)(i) (1980)); (b) interest payable to an "unrelated entity", precluding the pass-

---

**4.** Calculation on units-of-production basis means that depreciation costs for any gas plant facility or equipment is to be calculated for both the base quarter and the calendar month by amortizing the original cost of the particular investment equally over the total volume of NGLP reasonably expected to be produced from the facility or equipment regardless of the volumes actually produced or to be produced in the base quarter or in any calendar month. 10 C.F.R. § 212.165(b)(2)(i).

through of interest on loans between affiliated companies (212.165(b)(2)(viii)); (c) general and administrative expenses which are "directly and exclusively" attributable to gas processing operations, thus precluding the taking into account of increased costs incurred by processors which use the same administrative offices and personnel for more than one function (§ 212.165(b)(2)(v)); and (d) gathering expenses, except where the processor has a beneficial interest in the residue gas.[5]

## III  CONTENTIONS ON APPEAL

Appellants contend that the district court erred in (1) holding that the amended regulations governing the passthrough of increased non-product costs are arbitrary and capricious; (2) applying the "substantial evidence test", in addition to the arbitrary and capricious and rational basis tests, to the amendments; (3) holding that the regulation governing the passthrough of increased depreciation costs is procedurally invalid; (4) making an independent evaluation of the credentials and expertise of agency personnel; and (5) deleting from the regulations specific language, "thereby effectively rewriting the regulations to allow unrestricted passthrough of non-product costs."

## IV  STANDARD OF REVIEW

■ The district court concluded that the challenged amendments are "arbitrary and capricious, lacking in substantial evidence, and without rational basis." McCulloch argues that under the appropriate standard of review the court properly invalidated specific clauses in the revision because they were unsupported by substantial evidence.

The judicial review provisions of § 211(d)(1) of the ESA, 12 U.S.C. § 1904 note, which were incorporated into the EPAA by 15 U.S.C. § 754(a)(1), limit the scope of our review to a determination

whether the regulations were issued in excess of agency authority, are arbitrary or capricious, or otherwise not in accordance with law under the criteria set forth in 5 U.S.C. § 706(2). The pertinent provisions of 5 U.S.C. § 706(2) are:

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.    .    .    .    .

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence *in a case subject to sections 556 and 557 of this title* or otherwise reviewed on the record of an agency hearing provided by statute; (emphasis added)

Sections 556 and 557 prescribe the procedures to be followed for formal hearings and decision making. The agency action in controversy in this case is informal rulemaking, which is not subject to the formal hearing process unless required by statute to be made on the record. 5 U.S.C. § 553(c).[6]

In *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 700 (2 Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), the court held that "Section 706(2)(E) is restricted to agency action in which an evidentiary hearing is required . . . . [T]he appropriate standard for review of a regulation promulgated pursuant to the 'notice and comment' procedure has been recognized to be that specified by 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to hold unlawful and set aside agency action, findings, and conclu-

---

5. "Gathering expenses" refers to the cost of collecting and bringing to the plant the natural gas for processing. The limitation on gathering expenses results from the definition of "gas plant" in 10 C.F.R. § 212.162.

6. 5 U.S.C. § 553 sets out the procedure to be followed for informal rulemaking. The procedure under § 553 is commonly referred to as the "notice and comment" procedure.

sions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " [7]

In summarizing the appropriate scope of review under the arbitrary and capricious standard the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), held that a reviewing court must determine whether the decision of the agency was based on a consideration of the relevant factors, whether there was a clear error of judgment, and whether the agency has articulated a rational connection between the facts found and the choice made. The Court noted that under the arbitrary and capricious standard the scope of review is a narrow one, and while the reviewing court "may not supply a reasoned basis for the agency's action", it should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." The *Bowman* formulation in connection with the "rational basis" test has been followed by this court in *Texaco v. FEA*, 531 F.2d 1071, 1076–77 (Em.App.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Grigsby v. DOE*, 585 F.2d 1069, 1074 (Em. App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); and *Mobil Oil Corporation v. DOE*, 610 F.2d 796, 801 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).[8]

## V  VALIDITY OF REGULATIONS

### A.  *Units of Production Method of Depreciation*

#### 1.  *Procedural Validity*

The district court held the DOE's notice of proposed rulemaking was insufficient with respect to the passthrough of depreciation because the notice did not mention the units-of-production method incorporated into the final rule. 5 U.S.C. § 553(b) requires a proper notice of rulemaking to contain, in addition to the time and place of any proceedings and the underlying authority for the rules, "either the terms or substance of the proposed rule or a description of the subjects and issues involved."

An agency need not publish in advance every precise proposal it may ultimately promulgate as a rule. *California Citizens Band Association v. United States*, 375 F.2d 43, 48 (9 Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). Notice under § 553(b) is sufficient if it affords interested parties a reasonable and meaningful opportunity to participate in the rulemaking process. *Forester v. Consumer Product Safety Commission*, 559 F.2d 774, 787 (D.C.Cir.1977). In *Chrysler Corporation v. Dept. of Transportation*, 515 F.2d 1053, 1061 (6 Cir. 1975) the court noted, "When courts ... have overturned an administrative regulation on the ground of inadequate notice, usually either the agency gave no notice at all or there were major

---

**7.** The court noted further that the Supreme Court's reference in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to the "substantial evidence" test in connection with § 553 rulemaking proceedings was later clarified to mean that it is only applicable to the "hearing provisions of 5 U.S.C. §§ 556 and 557 or 'otherwise reviewed on the record of an agency hearing provided by statute ....' 5 U.S.C. § 706(2)(E)." *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 622 n.19, 93 S.Ct. 2469, 2479 n.19, 37 L.Ed.2d 207 (1973).

The "substantial evidence" test mentioned in § 211(d)(1) of the ESA, 12 U.S.C. § 1904 note, expressly applies only to agency orders, not to the issuance of regulations.

**8.** In *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1400 (Em.App.1975) we stated that "the judicial

function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Although several of our prior decisions used this language, see, e. g., *Mandel v. Simon*, 493 F.2d 1239, 1240 (Em. App.1974); *Pacific Coast Meat Jobbers Ass'n., Inc. v. Cost of Living Council*, 481 F.2d 1388, 1391 (Em.App.1973), we elaborated upon this approach in *Texaco v. FEA* and other cases cited *supra* by inclusion of the *Bowman* perception. The later case did not reject the "rational basis" test as a means of determining whether the agency had violated the "arbitrary and capricious" standard. It did provide further guidance for determining whether there was a "rational basis" for agency action, "the 'arbitrary and capricious test [not requiring] more.' " 419 U.S. at 290, 95 S.Ct. at 444.

**1222**

substantive differences between the proposed rule and the rule as adopted."

■ McCulloch contends that the units of production requirement differs substantively from the proposed rule, and that it prevents the company from recovering its capital costs. We disagree. The units-of-production requirement merely assures the accomplishment of the stated goal of the new regulations—which was to pass through increased depreciation costs *reflecting an increase in the level of capital investment.* Notice of Proposed Rulemaking, 42 Fed. Reg. 29490, 29493 (June 9, 1977) (emphasis added). As discussed below, the units-of-production method is necessary to accomplish this purpose in light of the "output-adjusted" approach, used throughout the petroleum pricing regulations, of comparing current costs with base period costs. See 43 Fed.Reg. 42987 (Sept. 21, 1978). Without the units-of-production limitation, depreciation costs per unit would "increase" with declining production even if the level of investment remained constant, a result not intended by the proposed rules. When the DOE discovered this deficiency after the notice was published, it adopted the units-of-production method to correct the oversight.[9]

A somewhat comparable situation was presented in *American Iron and Steel Institute v. EPA,* 568 F.2d 284 (3 Cir. 1977), where the EPA had proposed certain effluent limitations on various sectors of the steel industry. After an internal review,

the agency found substantial errors in estimated costs and technology comparisons underlying the proposed limitations. In affirming the "substantially more stringent" regulations adopted by the agency, the court concluded that the notice was sufficient because the more stringent standards involved the same subjects and issues mentioned in the notice. The court agreed with the court in *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 632 n. 51 (1973), that the submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different—even substantially different—from the proposed rule. As we have noted above, the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the "subjects and issues" before the Agency.

We believe the notice fairly apprised McCulloch and other interested parties of the substance of the depreciation rule sufficient to enable them to participate meaningfully in the rulemaking process. This is especially true since the notice did refer specifically to the "requirement to apply certain accounting procedures for certain items such as depreciation and extraordinary and irregular expenses."[10] 42 Fed.Reg. at 29493.

After issuing the notice, the DOE took written comments and oral testimony, and

---

**9.** The DOE explained that after the rule was proposed, the agency recognized that if the units-of-production method were not specified, the output method for determining non-product cost increases would allow the passthrough of *base period depreciation costs* by gas processors using the straight line method, and because the only expressed purpose of the proposed rule was to provide for the *prospective* passthrough of actual increased depreciation costs due to *new capital investment*, it was necessary to prescribe the units-of-production method of accounting.

**10.** The notice also warned that the agency would consider other amendments necessary to effect the intent of the proposals:

Commenters are urged to make as comprehensive a review of the proposed amendments as possible, *with regard not only to the text thereof, but also with regard to their context,* both within Subpart K and in relation to other pertinent subparts (e. g. Subparts E and F). *The FEA may consider any additional and collateral amendments to Subpart K . . . which are necessary to effectuate the intent of these proposals to be within the scope of this proposed rulemaking,* and it accordingly reserves the option to make any such additional amendments as part of a final rulemaking in this proceeding, without further notice of proposed rulemaking with respect thereto.

42 Fed.Reg. 29491 (June 9, 1977) (emphasis added).

after considering relevant matter, "incorporate[d] in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). Having complied with all of the procedures mandated by § 553, which express the maximum procedural requirements which Congress intended courts to impose on agencies conducting rulemaking proceedings, *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978),[11] the regulations withstand McCulloch's procedural attack.

### 2. Substantive Validity

■ In determining the validity of the rule for passthrough of increased depreciation expense, we must consider whether the DOE considered relevant factors and articulated a rational basis for the rule adopted, or whether the agency clearly erred in requiring the units-of-production method for processors who choose to pass through increased depreciation instead of using the adjusted price concept.[12] *Bowman, supra.* Both the notice of proposed rulemaking and the preamble to the final rules demonstrate that the DOE carefully considered the purpose and effect of the depreciation rules. The agency's judgment was not clearly erroneous; to the contrary, the units-of-production requirement was carefully designed to achieve the purpose of increasing prices only to the extent that actual costs have increased. The DOE's preamble to the rule explains the rational basis for the requirement.

Prior to the challenged amendments to Subpart K, the DOE[13] did not allow price increases due to depreciation costs. Recognizing the need for incentive to invest in new gas plants to increase the supply of NGLP, the DOE reversed its position and proposed to allow depreciation as one of the categories of expenses whose increases could be passed through to raise prices for NGLP. The gas processing industry universally approved this decision.

The notice of the proposed rulemaking makes it clear, however, that the DOE intended to allow price increase only to reflect actual cost increases:

[I]t has never been the policy of the FEA to deny to gas processors the recovery of *actual increased non-product costs* attributable to gas plant operations, provided that a means can be devised for properly defining the appropriate costs and limiting the recovery thereof so as to prevent unjustified increases in the prices of [NGLP].

42 Fed.Reg. 29492 (June 9, 1977) (emphasis added). With respect to depreciation, actual increased cost means actual increased capital investment. In discussing the alternative incentives for gas plant investment, the notice stated:

[T]he FEA ... believes that the allowance of increased costs and depreciation should serve as such an incentive, at least for those processors that have established May 1973 depreciation costs and for whom, therefore, *any increased levels of capital investment made since that time would be reflected in increased depreciation costs.*

42 Fed.Reg. 29493 (emphasis added).

The DOE did not intend to allow price increases for mere paper "increases" in unit depreciation costs where there has been no new investment. But that is precisely what would have occurred if the depreciation rule had been adopted as proposed. The "output-adjusted" method of comparing current

11. We recognize that Congress can and has imposed stricter procedures on agencies, such as those under the FEAA, 15 U.S.C. § 761 *et seq.* See *Shell Oil Co. v. FEA*, 574 F.2d 512, 516 (Em.App.1978). We find no failure to comply with procedural requirements of the FEAA.

12. 10 C.F.R. § 212.164(c)–(e) provides incentive for qualified investment in gas plants in the form of "adjusted prices". A firm must elect between using these price incentives and the passthrough provisions. See 43 Fed.Reg. 42987 (Sept. 21, 1978).

13. Although the DOE did not take over responsibility from the FEA for administering the allocation and pricing regulations until after the instant rulemaking was in progress, for simplicity we refer to the Department of Energy and its predecessors as "the DOE."

costs with base period cost results in costs expressed in terms of dollars per unit produced. Since price is also expressed in dollars per unit, the output-adjusted method determines the allowable increment to be added to base prices in the current month.

Under the output-adjusted method some costs, such as depreciation, do not actually vary with production, but their unit costs increase when production declines even though a processor has experienced no actual increase in cost. To correct this unintended benefit, the DOE adopted the rule requiring processors to calculate depreciation, *for pricing purposes*,[14] under the units-of-production method. 43 Fed.Reg. 42987–88 (emphasis added). The rule insures that unit costs, and therefore prices, will not increase unless the level of investment has increased.

The DOE explained at length its reasons for requiring the units-of-production method to determine allowable price increases. See 43 Fed.Reg. 42988. The DOE distinguished gas processing from crude oil refining, in that production from gas plants declines as feedstock from specific sites is depleted. Oil refineries can maintain a relatively constant output through transportation and exchange arrangements. The DOE reasonably presumed that a gas processor would base a decision to invest in a gas plant on a determination of the probable return over the productive life of the field the plant would serve, taking into account declining production. It does not matter whether "productive life" is measured by units of liquid or by time. If prevailing prices at the time would not justify the investment, it wouldn't be made.

This economic analysis underlies the DOE's reasonable presumption, "the premise upon which the basic structure of these cost-based regulations rests," that base period prices reflected recovery of all costs, including capital costs, of production from gas plants in existence during the base period.[15] See 43 Fed.Reg. 42988.

Under the regulations, if new plants are built and put into production, or if new improvements result in more output, the units-of-production method will reflect higher unit costs for depreciation, and prices could be increased accordingly. This is exactly what was intended in the proposed rules.

McCulloch argues that the depreciation limitations represent triple discrimination: (1) in treating depreciation differently from all other costs; (2) in treating gas processors differently from other sectors of the petroleum industry; and (3) in discriminating against processors who use straight line depreciation. The simple answer to these contentions is that depreciation and gas processors are in fact different.

Under the output-adjusted method, declining production accounts for part of the rise in unit costs for other items such as plant labor, maintenance, and utilities. But these costs must be calculated as they are incurred, and the actual amounts expended for these items change from period to period. There is at least a close connection between the amounts McCulloch expended and the benefit derived from the expense.

Depreciation expense differs in that capital expenditures do not change, except as new investments are made. A variety of

---

14. It is important to note that the units-of-production method is required only to determine prices. Contrary to McCulloch's contentions, the rule does not affect the firm's ability to recover in the base price capital costs for existing assets. For example, assume constant costs and prices and no new investments. The fixed amount of production over the life of the asset will generate the same revenue regardless of what depreciation method is used. If the base price is not sufficient to recover existing capital costs, that results from miscalculation by McCulloch, not from the application of the price regulations.

15. If for some reason a processor's base does not reflect the costs of production during the base period, that is a proper matter for consideration in the exceptions process. In any event, such a situation results from management errors, not from the application of the regulations. If costs and prices had remained constant, the same processors would not be able to recover their investments. It would be anomalous to allow an automatic price increase to those processors because of regulations whose principal purpose is to limit prices.

methods may be used to allocate capital costs over the useful life of an asset. Any method chosen will be artificial. Depreciation calculated under the units-of-production method is a reasonable choice which more closely reflects the benefit derived from a gas plant in a given period. Depreciation and other expenses may then be treated comparably under the output-adjusted method of calculating cost increases.

Gas processing differs from other sectors of the petroleum industry. Even though the flow of crude oil varies somewhat, the output of a given refinery can be maintained at a relatively constant rate because a refinery need not depend on a single source of raw materials. Gas plants typically rely on a single field or group of fields for their source of feedstock. This justifies the difference in depreciation rules between sectors.

Finally, the contention that the rule discriminates against processors who use straight-line depreciation is based on a misunderstanding of the intent, operation, and effect of the rule. If new investments are made, the rule will reflect higher depreciation costs which can be passed through. The rule does not prevent recoupment of the costs of assets in existence during the base period. These costs are being recovered in base prices for NGLP. The units-of-production basis is required only for pricing purposes. McCulloch is free to employ whatever method it desires, consistent with tax laws and generally accepted accounting procedures, for book purposes or tax purposes.

McCulloch's arguments for invalidating the depreciation provisions are without merit. The regulations are not only rational, but are well-suited to effect a dollar-for-dollar passthrough of increased costs without allowing prices to increase because of mere accounting procedures bearing little relation to economic realities.

**B.  Interest Expense**

█ McCulloch objects to the restrictions on passthrough of increased interest expenses on two grounds: (1) limiting the passthrough to interest paid to an "unrelated entity;" and (2) allocating interest costs on the basis of operating costs or investment costs of gas plant operations relative to overall operations.

**1.  Unrelated Entity**

10 C.F.R. § 212.165(b)(2)(viii) provides:
*Interest cost.* Interest cost is the dollar amount incurred for interest on the amount of money borrowed from an unrelated entity for the purpose of constructing, expanding, or operating a gas plant, or which is otherwise attributable (based on relative operating costs or investment costs) to gas plant operations. For purposes of this paragraph (b)(2)(viii), the term "unrelated entity" has the meaning given that term in paragraph (b)(2)(ii) of this section.

10 C.F.R. § 212.165(b)(2)(ii) defines "unrelated entity" as
an entity which is not part of the firm and which has no equity interest in any gas plant or plants (or in the [NGLP] produced therefrom) in which the firm has such an interest.

The DOE did not explain, either in the notice of proposed rulemaking or in the preamble to the final rules, why the passthrough of interest payments should be limited to an "unrelated entity." We may properly inquire into whether there was a contemporaneous explanation of the agency decision to preclude passthrough of interest on loans from related corporations. *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, supra,* 435 U.S. at 549, 98 S.Ct. at 1214; *Bowman, supra.* The DOE did not even discuss the relevant factors considered in imposing the restriction. The DOE's failure warrants the district court's finding that the restriction on passthrough of interest to unrelated entities only is arbitrary and capricious.

The DOE argues that the limitation is necessary to prevent "sweetheart loans" between related corporations, and that since the regulations now authorize automatic passthrough, it would be difficult to moni-

tor the expenses being passed through. DOE did not articulate any bases for its assumption that sweetheart loans are common-place or that related entities are incapable of arm's length transactions.

The administrative convenience rationale likewise fails to persuade us. The regulations provide for allocation of processing costs among related functions of a firm, including interest costs on a general line of credit to firms engaged in more than one business. Certainly auditing interest rates charged would be no more difficult than monitoring a firm's allocation among various functions. Prevailing interest rates are generally well-known. It would be a simple matter to compare the interest rates charged between related entities with those charged by third parties. As the district court concluded, the new rule "gives some companies the unfettered right to recover their interest payments while denying that opportunity to other firms." The restriction was properly set aside as arbitrary and capricious.

### 2. Allocation of Interest

██ The other aspect of the interest provision challenged by McCulloch doesn't suffer from the same infirmities. In response to industry comments, the DOE expanded the scope of allowable interest passthrough to include interest on loans to acquire working capital or other purposes "attributable to gas plant operations." The proposed rule allowed passthrough of interest only on borrowing for the purpose of construction, expansion, or operation of a gas plant.

The DOE recognized that not all borrowing can be associated with a particular use. For unspecified borrowings, it was necessary to devise some means of assuring that interest expense incurred for the benefit of other operations would not be passed through in the price of NGLP. The agency decided to allocate general interest costs on the basis of operating costs or investment costs of gas plant operations relative to overall operations. The DOE explained:

The purpose of permitting an allocation of general interest costs is simply to rec-

ognize that corporate borrowings represent an accumulation of funds necessary to permit the conduct of all of its businesses, that it is difficult if not impossible to trace specific funds, and that where such borrowings are not for a discrete purpose they actually benefit all of such operations. The principle of allocating on the basis of either proportionate costs or proportionate investment is intended to provide for an allocation on the basis of the relative need for capital of one type of operation vis-a-vis other corporate operations.

43 Fed.Reg. 42991 (September 21, 1978). We agree with the DOE that the "allocation of interest costs on this basis [is] a rational means of attributing such capital costs to gas plant operations." *Id.*

McCulloch expresses concern with the DOE's statement in the preamble that "[w]here the [lender's] recourse is against the earnings or assets of more than one type of operation of the firm, then the borrowing will ordinarily be deemed to be attributable to all of such operations." *Id.* McCulloch construes this statement to mean that the cost of borrowing will be allocated among the various operations in proportion to the value of assets used to secure a loan. The rule itself, however, does not require such an allocation. The statement merely represents an agency policy of presuming that borrowings secured by assets from various operations were made for the benefit of all of those operations. The allocation of interest costs would then be made on the basis of proportionate operating costs or proportionate investment explained above.

Moreover, the context of the statement indicates that the presumption operates only when a specific purpose for borrowing does not appear. To avoid the presumption, a processor need only demonstrate "by reference to representations made in the loan request documents, security agreements, or other relevant evidence" that the loan was used for gas plant operations. As long as McCulloch can demonstrate the purpose for a loan and that the funds were used for that purpose, it will not matter that its parent's assets were used to secure the loan.

## C. *General and Administrative Expenses*

■ In the notice of proposed rulemaking the DOE proposed a category of overhead costs to allow the pass-through of "insurance, outside legal and accounting fees, and inter-gas plant transportation costs directly attributable to gas plant operations." 42 Fed.Reg. 29509. After receiving numerous comments objecting to the restrictive nature of this category, the DOE expanded the category and designated it "General and Administrative" (G&A) costs. 10 C.F.R. § 212.165(b)(2)(v) provides:

> General and administrative costs are the ordinary and necessary expenses of management and administration (including overhead) attributable to gas plant operations under generally accepted accounting principles historically and consistently applied by the firm. *Provided,* That any such costs which are attributable to or incurred by, a corporate or other organizational administrative unit not directly and exclusively involved with gas plant operations shall not be an allowable cost. . . .

The DOE stated that it expanded the category beyond that allowed to oil refiners under Subpart E because otherwise many gas processors would be prevented "from passing through increased costs they have actually incurred and which they would not have incurred in the absence of their conduct of gas processing operations." 43 Fed. Reg. 42990.

McCulloch argues that the impact of this rule falls more harshly on small gas processors than on larger companies who can afford to set up separate administrative offices devoted exclusively to gas processing. Ironically, the comments submitted from large oil companies such as Texaco and Shell indicate that gas processing plants, being widely scattered and small by crude oil refinery standards, cannot economically justify full-time staff for accounting, purchasing, tax, legal, and other administrative needs. These large corporations also centralize their administrative functions to achieve economic efficiency.

The DOE justified the exclusivity requirement on the ground that "it cannot reasonably be presumed that those higher level organizational 'G&A' costs would be eliminated in the absence of gas plant operations where the firm also engages substantially in other operations." [16] 43 Fed.Reg. 42990. Whether the DOE's rationale passes judicial review presents a close question. The DOE sought to prevent the purchasers of NGLP from subsidizing other unrelated products. The agency acknowledged in its brief that the rule may cause purchasers of other products to subsidize NGLP, but reasoned that this was a legislative policy choice the DOE was required to make "to protect the prices of sensitive residential heating products such as propane and butane."

We are reluctant to appear to second guess policy choices made by an agency, but it seems that the DOE failed to consider a number of relevant factors in exercising its choice. The industry comments indicated that all but the relatively few firms who are engaged solely in gas processing will be precluded from passing through increased costs actually incurred to benefit gas processing operations. This is inconsistent with the assurances that DOE provided during the rulemaking process that its policy was to allow processors to pass through increased non-product costs. DOE has thus failed to demonstrate a "rational connection" between the stated policy and the indication that few firms will be able to pass through these increased costs. We agree with the district court that the DOE did not consider the economic realities facing the majority of the firms comprising the gas processing industry.

Moreover, the DOE failed to give adequate consideration to the impact of its choice on the achievement of Congressionally mandated goals of the EPAA expressed in 15 U.S.C. § 753(b)(1). The regulation contravenes two of these goals—to achieve "to the maximum extent practicable" the promotion of economic efficiency,

---

**16.** The district court found that "This allegation is not supported by the administrative record."

§ 753(b)(1)(H), and the minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms, § 753(b)(1)(I)—without advancing any other countervailing goals.

The DOE's concern for the prices of NGLP should not completely override the concomitant need for economic efficiency. The rule should foster efficient operation wherever possible and reflect the economic realities facing the gas processing industry. To require other products and operations to subsidize NGLP is an unnecessary distortion of the market as long as there exist reasonable alternatives to allocate costs to NGLP.

The DOE's premise that G&A costs would not diminish if gas plant operations were eliminated appears to be based on sheer speculation. Its decision to restrict passthrough to only those administrative units exclusively involved with gas processing lacks a rational basis, ignores relevant factors, and amounts to a clear error of judgment. The rule was therefore properly set aside as arbitrary and capricious.

### D. *Gathering Expenses*

McCulloch's final challenge concerns the DOE's definition of "gas plant" as it relates to gathering facilities, i. e., the pipelines and field compressors which collect raw natural gas from separators at oil wells and carry the gas to plants for processing into NGLP. 10 C.F.R. § 212.162 provides in pertinent part:

> For purposes of computing increased processing costs under § 212.165, . . . a "gas plant" includes any natural gas or natural gas liquid gathering facilities and the transportation lines (including compression stations) connecting these facilities to the actual physical plant at which the natural gas or natural gas liquids are processed: *Provided,* That natural gas gathering facilities and related transportation lines shall be considered a part of a gas plant for these purposes only if the first seller of the natural gas liquids or natural gas liquid products produced in

the plant has no beneficial interest in the residue gas from the plant.

The development of the gathering expense limitation parallels that of the G&A expense provision. The proposed rules did not include gathering facilities within the definition of gas plant, but the DOE asked for industry comment. The comments indicated that gathering facilities often constitute a significant investment to a firm, and that most gas processors consider them a necessary and integral part of gas plant operations. Processors thus urged the incorporation of all gathering facilities within the definition of gas plant.

The DOE acknowledged the importance of gathering facilities, but adopted a proviso that for many processors nullifies the rule permitting passthrough of gathering costs. The DOE admits that a portion of the cost of gathering facilities could logically be attributed to NGLP even where the firm incurring those costs also has an interest in the residue gas, but attempts to justify the limitation on the ground that only when the processor has no interest in the residue "is it clear that the party bearing these costs must recover these costs in [NGLP] prices or not recover them at all." 43 Fed.Reg. 42985.

Like the G&A expense limitation, the DOE's response is an irrational solution to a simple allocation problem. Gas processors must invest in gathering facilities to bring raw material to their gas plants. Merely because natural gas gathering facilities also benefit related operations, such as gas transportation and gas sales, is no reason to deny passthrough of any gathering expenses incurred by firms engaged in more than one business.

The DOE notes that the Federal Energy Regulatory Commission (FERC), which regulates gas sales, allows increments to gas prices to permit recovery of gathering costs. McCulloch argues, and the district court found, however, that the FERC allowances are inadequate to recover gathering costs.[17]

---

17. During the rulemaking proceedings, DOE was advised by several comments "that the expense of gathering must be recovered from the sales of NGLP's or it would not be recovered at all."

The DOE did not controvert this conclusion. In effect, the DOE again would require gas sales to subsidize NGLP prices. Like the G&A restrictions, the DOE's solution unnecessarily distorts the market and promotes inefficiency.

The DOE admits that its judgment was based on an inadequate factual record, but described the rule as temporary until more information could be gathered to assure that gas processors would not recover gathering expenses twice. No further proceedings have been undertaken to update the rule, however, so we see no reason not to treat the rule as final. Some restrictions may be required to prevent double recovery, but the blanket prohibition found in the challenged amendment exceeds any logical solution to the problem and conflicts with the agency's stated purpose of allowing a passthrough of costs. The restriction lacks a rational basis and ignores relevant factors. The district court properly found it arbitrary and capricious.

## VI  PROPRIETY OF DISCOVERY

■ The district court granted McCulloch's request to depose certain officials responsible for the rulemaking. The court limited the scope of the depositions to avoid probing the mental processes of the decisionmakers. The depositions were to be used solely to determine the completeness of the administrative record. McCulloch's attorneys, however, asked questions regarding the rulemakers' expertise and experience and the routes by which certain rules were developed. The district court in its opinion found the record complete, but also used information contained in the depositions to invalidate the rulemaking, characterizing it as "an almost incredible process."

■ We agree with the DOE that the court exceeded its authority in its consideration of the depositions. In *Vermont Yankee Nuclear Power Corporation, supra*, the Court noted the broad discretion vested in an agency to decide how it may best proceed to develop the needed evidence to support its decision, 435 U.S. at 544, 98 S.Ct. at 1211, and warned that unwarranted judicial examination of perceived procedural shortcomings of a rulemaking proceeding seriously interferes with the process prescribed by Congress. *Id.*, at 548, 98 S.Ct. at 1214. In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), the Court approved requiring administrative officials to explain their actions, but only where the agency has not articulated its findings on the record or where there is a strong showing of bad faith or improper behavior. As stated in *Vermont Yankee, supra*, 435 U.S. at 549, 98 S.Ct. at 1214, "[W]hen there is a contemporaneous explanation of the agency decision, the validity of the action must 'stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review.'" (citations omitted).

The DOE explained most of the challenged provisions in the preamble to the rules. The proferred explanations establish an adequate basis to support the rules adopted. Since the record was complete, it enabled the court to review the agency's decision without going behind the record to probe the mental processes of the decisionmakers. See *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

## VII  SCOPE OF REMEDY

■ We agree with the DOE that the district court intruded into the function of the DOE in selectively excising specific language in the rules. McCulloch cites cases where courts have stricken specific portions of statutes and regulations, but those authorities have recognized that partial invalidation of a regulation is permitted only when the invalid portions are severable without affecting the purpose of the regulation. See *e. g., Fowler v. Gage*, 301 F.2d 775 (10 Cir. 1962).

The restrictions found invalid here are an integral part of the regulations. The DOE's desire to limit passthrough of costs is rational, even if the particular restrictions

# 1230

imposed are not. The DOE must be given the opportunity to rewrite regulations with rational limitations based on its consideration of relevant factors. As the Supreme Court admonished in *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 619, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944), "It is not for us to write a definition. That is the Administrator's duty."

The Supreme Court more recently recognized "well-established authority" that absent extraordinary circumstances, "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 792–93 n. 15, 98 S.Ct. 2096, 2110–11 n.15, 56 L.Ed.2d 697 (1978). The district court reasoned that further delay in instituting regulations of the gas processing industry will frustrate the purposes of the EPAA. We do not believe, however, that there are extraordinary circumstances warranting judicial intrusion into the agency function. The court's order may require the DOE to expedite the proceedings to alleviate the effect of further delay.

## VIII CONCLUSION

We conclude that: (1) the depreciation regulations are procedurally and substantively valid, and may be enforced as adopted; (2) the restriction on passthrough of increased interest lacks a rational basis insofar as it denies recognition of interest paid to related entities, but otherwise is valid and enforceable; (3) the district court properly found that the regulations of general and administrative expenses and gathering expenses are arbitrary and capricious; and (4) the district court erred in excising specific language from the regulations and in effect rewriting the regulations.

Affirmed in part; reversed in part; and remanded to the district court for further proceedings consistent with this opinion.