**MAPCO INTERNATIONAL INC.,**
Plaintiff–Appellant,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, et al., Defendants–Appellees.**

**MAPCO INTERNATIONAL INC.,**
Plaintiff–Appellee,

v.

**UNITED STATES of America, Defendant–Counterclaimant–Appellant.**

Nos. DC–119, 120.

Temporary Emergency Court of Appeals.

Argued: March 15, 1993.

Decided: April 29, 1993.

Richard F. Ahern and Don Crockett, Judicial Litigation Div., Economic Regulatory Admn., U.S. Dept. of Energy, Washington, DC, were on the briefs for defendants-appellees and defendant-counterclaimant-cross-appellant.

James P. Denvir, Jerry E. Rothrock, Daniel Joseph and Anne C. Christman, Akin, Gump, Hauer and Feld, Washington, DC, were on the briefs for appellant Mapco and appellee Mapco.

Dina R. Lassow, James F. Flug and Henry Banta, Lobel, Novins, Lamont and Flug, Washington, DC, were on the briefs for amicus curiae The States.

Before GRANT, METZNER and BROWN, Judges.

GRANT, Judge:

Before this court are the consolidated appeals of TECA Nos. DC–119 and 120.[1] They arise from a Remedial Order [RO] issued by the Department of Energy [DOE][2] on April 21, 1986, against MAPCO International [MAPCO], charging MAPCO with violations of certain crude oil resale regulations and ordering payment of overcharges. On January 30, 1992, the district court granted the DOE's motion for summary judgment and affirmed the final agency decision by upholding its RO. *MAPCO Intern. Inc. v. F.E.R.C.*, 783 F.Supp. 639 (D.D.C.1992). On May 11, 1992, the district court awarded the government prejudgment interest but disallowed interest for the periods of undue administrative delay. *MAPCO Intern. Inc. v. F.E.R.C.*, 791 F.Supp. 315 (D.D.C.1992).

MAPCO and the government defendants have cross-appealed, and fourteen states have filed a brief as amici curiae. For the reasons presented below we affirm in part and reverse in part.

## I. BACKGROUND [3]

MAPCO is a company incorporated in July 1978 by its parent (Mapco, Inc.) to do business as a crude oil "reseller."[4] It transacted "in-line" transfers of the crude oil by arranging to buy from one reseller and sell to another at a higher price.[5] It frequently

---

1. TECA No. DC–118, which had originally been consolidated with DC–119 and DC–120, was dismissed as moot by agreement of the parties on March 4, 1993.

2. There are three defendants in this case: the DOE, its predecessor the Federal Energy Regulatory Commission [FERC], and the United States, which intervened. The court will refer to them collectively as "the government" or "the agency."

3. Because the facts herein are uncontested and have been amply chronicled by the district court at 783 F.Supp. 640–43, we present only the information necessary to our analysis on appellate review.

4. "A reseller was defined as a firm which carried on the trade or business of purchasing crude oil and reselling it, 'without substantially changing (its) form, to purchasers other than ultimate consumers.' 10 C.F.R. Sec. 212.131." *United States v. Sutton*, 795 F.2d 1040, 1052 (Temp.Em.Ct.App.1986).

5. The DOE explained "in-line transfer" in its Remedial Order of April 21, 1986:

In an in-line transfer, a firm obtained title to crude oil to be delivered in the future and transferred that right to future delivery to another firm. These transactions occurred before the crude oil physically entered the pipeline. It is undisputed that with respect to the alleged layered transactions, MAPCO never

resold crude oil in various transactions in which the company did not take physical possession of the crude oil by transporting, gathering, or storing it. According to MAP-CO, such transactions were a common feature of the industry prior to price controls, and MAPCO continued to engage in them after price controls were abolished in early 1981.

In the latter half of the 1970s there was a large increase in the number of resellers and a change from the traditional reselling activities of gathering, storing and transporting crude oil, as they had historically done in the past, to an almost instantaneous transfer of title from a seller to a buyer. In response the DOE promulgated a new set of regulations in 1978, designated 10 C.F.R. Part 212, Subpart L, that applied to resales of crude oil. In general, the regulations were established to limit the legitimate resellers (those gathering and moving the crude oil) to a "permissible average markup" (PAM) of their prices each month, and to deny price markups for resales in which no legitimate reselling service was performed. This latter activity, which inflated prices of crude oil when none of the services traditionally associated with resale of crude oil was performed, is called "layering." The layering rule provides:

> The price of crude oil charged by a reseller which in a sale performs no service or other function traditionally and historically associated with the resale of crude oil shall not exceed the actual price paid by the reseller of the crude oil, less any amount received in an exchange and any amount received in excess of the amount paid in a matching purchase and sale transaction having the same effect as an exchange, plus any amount paid in an exchange and any amount paid in excess of the amount

received in a matching purchase and sale transaction having the same effect as an exchange.

42 Fed.Reg. 64856, 64865 (Dec. 29, 1977), *reprinted at* 10 C.F.R. § 212.186.

On June 30, 1983, the DOE issued a Proposed Remedial Order [PRO] alleging that, in 105 in-line transactions between August 1978 and November 1980, MAPCO failed to perform any function traditionally associated with the resale of crude oil, and had engaged in these transfers solely to inflate the price of crude oil to down-stream purchasers.[6] R. 6022 ff. The DOE charged that MAPCO had violated the prohibition against layering and had charged prices that resulted in excessive markups. R. 6036–39. The Office of Hearings and Appeals [OHA] affirmed the PRO in its Remedial Order of April 21, 1986. *MAPCO Int'l Inc.*, 14 DOE ¶ 83,019 (1986). It ordered MAPCO to pay restitution exceeding $1.99 million plus interest. *Id.* at 86,168.

Appealing to the next administrative level, MAPCO sought to have the Federal Energy Regulatory Commission [FERC] declare the Mandatory Petroleum Price Regulations, including Subpart L, invalid. On December 10, 1987, the Commission's Order concluded that it had no authority to declare the DOE regulations invalid. R. 7301–04. At that point MAPCO moved the issues from the administrative to the judicial sphere.

Joined by two other firms, MAPCO filed a declaratory judgment action in district court, asking the court to require FERC to determine the validity of the layering rule. That action was dismissed on October 27, 1988 as unripe. While the district court action was under advisement, the agency's Administrative Law Judge issued his ruling on June 29, 1988, affirming the Remedial Order. R. 7315–31.

---

gathered, transported or arranged for the transport of crude oil, nor did it ever have physical possession of crude oil.
R. 4940.

**6.** The district court described the 105 transactions at issue thus:

A party would sell MAPCO title to thousands of barrels of crude oil as they passed a particular point in a pipeline. Almost instantaneously MAPCO would transfer title to another party, receiving a mark-up in price even though it performed no services. The same oil that was bought and sold by MAPCO was the subject of multiple purchases and sales as it made its way from the pipeline entrance to the refinery. In all 105 transactions, MAPCO bought from another crude oil reseller and sold to another crude oil reseller. In none of the transactions did MAPCO buy from an oil producer or sell to an oil refiner.

*MAPCO*, 783 F.Supp. at 642.

On April 11, 1991, MAPCO filed its first amended complaint, asking the court to declare that the FERC unlawfully failed to consider its defenses and to order the FERC to decide MAPCO's appeal of the RO, which had been issued 5 years before. While MAPCO's petition was pending in district court, FERC issued its final Order of July 17, 1991 affirming the RO. R. 7704–07. The Commission reiterated its decision that general legal challenges to the layering rule, made without reference to particular facts before it, were not within the scope of Commission review. It reminded MAPCO that it had ample opportunity to advance legal objections to the layering rule that related to specific facts in its case. Thereafter the district court ordered the parties to file summary judgment motions in light of the FERC ruling.

On January 30, 1992, the court granted the government's motion for summary judgment. *MAPCO,* 783 F.Supp. at 647. Designating the layering rule as interpretative, it found that the rule was procedurally valid and clear on its face. *Id.* at 643–44. It then affirmed FERC's affirmance of the RO. *Id.* at 647. Its ruling on prejudgment interest, issued on May 11, 1992, imposed prejudgment interest on MAPCO but adjusted the amount by tolling the periods during which administrative agencies took longer than six months to decide a pending matter. *MAPCO,* 791 F.Supp. at 317.

MAPCO appeals, challenging the procedural validity and the DOE's interpretation of the layering rule. It also contends that the DOE's finding that MAPCO violated the "permissible average markup" rule is arbitrary and capricious. The government cross-appeals the district court's reduction of MAPCO's obligation to make full restitutionary payment of all prejudgment interest.

## II. SCOPE OF REVIEW

 An appellate court's examination of the summary judgment determination of the district court is a *de novo* review of the record and controlling law. *Bush v. United States,* 989 F.2d 509, 509–10 (Temp.Em.Ct.App.1993) (citations omitted). However, judicial review of an agency action is statutorily limited by § 211(d)(1) of the Economic Stabilization Act of 1970: The order may be set aside only if it is "in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note; *Pratt v. Watkins,* 946 F.2d 907, 909 (Temp.Em.Ct.App.1991). The Temporary Emergency Court of Appeals [TECA] recognizes the DOE's administrative expertise and accord the agency's determination great deference. *Research Fuels, Inc. v. U.S. Dept. of Energy,* 977 F.2d 601, 606–07 (Temp.Em.Ct.App.1992); *Thriftway Co. v. Dept. of Energy,* 920 F.2d 23, 25 (Temp.Em.Ct.App.1990). Therefore, this court must approve the DOE decision if there is a rational basis for it. *Id.;· Behm Family Corp. v. Dept. of Energy,* 903 F.2d 830, 833 (Temp.Emer.Ct.App.1990).

 It is also "well established 'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. Occupational Safety and Health Review Commission,* 499 U.S. 144, ——, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) (quoting *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986)).

> In situations in which "the meaning of [regulatory] language is not free from doubt," the reviewing court should give effect to the agency's interpretation so long as it is "reasonable," that is, so long as the interpretation "sensibly conforms to the purpose and wording of the regulations."

*Id.,* 499 U.S. at ——, 111 S.Ct. at 1176 (citations omitted). *Accord, Thriftway Co. v. Dept. of Energy,* 867 F.2d 1577, 1580–81 (Temp.Em.Ct.App.1989). Thus our review of the agency's regulations is circumscribed: We determine solely "whether the regulations were issued in excess of agency authority, are arbitrary or capricious, or otherwise not in accordance with law." *McCulloch Gas Processing Corp. v. Dept. of Energy,* 650 F.2d 1216, 1220 (Temp.Em.Ct.App.1981).

## III. DISCUSSION

### A. Procedural Challenge to Layering Rule

At the time the layering rule was promulgated, section 7(i)(1)(B) of the Federal Energy Administration Act of 1974 [FEAA] estab-

lished the notice requirements for agency rulemaking:

> Notice of any proposed rule, regulation or order ... shall be given by publication of such proposed rule ... in the Federal Register....

15 U.S.C. § 766(i)(1)(B) (1976) (repealed 1977).[7] MAPCO asserts that the DOE's failure to publish the text of a proposed layering rule before adopting it was a violation of the strict notice requirements of the FEAA. It supports its argument with this court's decision in *Shell Oil v. Federal Energy Admin.*, 574 F.2d 512 (Temp.Em.Ct.App.1978), which required the agency to provide additional opportunity for comment following publication of a proposed rule which varied from the prior interim rule.

The district court, rejecting MAPCO's contention, determined that the DOE met all applicable legal standards for promulgating a valid regulation. *MAPCO*, 783 F.Supp. at 644. It found first that, as an interpretative rule, the layering rule did not require notice and comment. Nevertheless, it also found that the rule was properly adopted even under the stricter promulgation requirements for non-interpretative rules. *Id.* at 643–44.

> In this case, the Department of Energy gave a description of what constituted traditional reseller practices in its October 1976 notice. It then gave a specific definition of prohibited "layering" in its August 1977 notice. Finally, it adopted a rule which incorporated almost identical language to that used in the August notice and used the preamble to state that the rule on which it accepted comments was the rule it was promulgating. Plaintiff had plenty of notice and opportunity to comment on the layering rule. The Department clearly met all the requirements imposed by the Federal Energy Administration Act and produced a procedurally valid rule.

*Id.* at 644.

**(1)** *The layering rule as an interpretative ruling*

 A rule is interpretative if (1) the agency deems it to be interpretative, and (2)

in nature and effect the ruling is in fact and law an interpretation of an existing statutory or regulatory provision. *Energy Reserves Group, Inc. v. Dept. of Energy*, 589 F.2d 1082, 1092 (Temp.Em.Ct.App.1978).

> Interpretative rules simply state what the statute or regulation has always meant in the opinion of the administrative agency issuing the interpretative rule.

*Id.* at 1100. In general, interpretative rules may interpret virtually anything: statutes, legislative rules, other interpretative rules, or judicial or administrative decisions or rulings. 1 K. Davis, *Administrative Law Treatise* § 5.03, 1.c. 304, *quoted in Energy Reserves Group*, 589 F.2d at 1092.

In this case, the agency announced, in its preamble to the new Subpart L regulations, that it intended to clarify the price regulations by forbidding layering.

> FEA solicited comments on whether regulatory amendments or interpretive rulings were necessary to make it clear that the practice known as "layering," described in the August 9 Notice, is not permitted under the price regulations. Several of the comments opposed a special rule on layering.... However, a relatively large number of comments offered proposals to restrict layering, and information available to ERA indicates that there may be a significant number of instances of layering. Accordingly, the rule adopted today includes a provision which is intended to discourage layering but which should not interfere with normal transactions among resellers.

42 Fed.Reg. 64856, 64859 (Dec. 29, 1977). The final rule also described the layering amendment being adopted:

> H. *Layering.* The amendments provide that a firm which performs no service or other traditional reseller function in a sale may not charge a price in excess of the firm's cost of the crude oil sold.

Fed.Reg. at 64863. The Administrative Law Judge considering MAPCO's challenge to the

---

**7.** After the repeal of the FEAA, procedural requirements for DOE rulemaking were set forth in the Department of Energy Organization Act [DOEOA] § 501 (as amended), 42 U.S.C. § 7191 (Supp. III 1979).

layering rule explained that the rule is an interpretation of the "normal business practices"[8] or "anti-circumvention"[9] rules, which "prohibited essentially the same type of conduct as did the layering rule." *MAPCO*, 14 DOE ¶ 83,019 at 86,157.

■ It is clear from the preamble to the rule that the agency intended to clarify the price regulations by forbidding layering. By its nature and effect, the ruling was an interpretation of prior price regulations, an exemplification of a practice that contravenes normal reselling practices. Since the layering rule is a reasonable interpretation of the price regulations, consistent with the language of the definitions therein, *see Pennzoil Co. v. U.S. Dept. of Energy*, 680 F.2d 156, 179 (Temp.Em.Ct.App.1982), *cert. dismissed,* 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983), and as such had no "impact" because the impact came from the statute or regulation being interpreted, then the interpretative ruling "was a reasonable contemporaneous construction of the statute and created no new law or legislative rule." *Energy Reserves Group*, 589 F.2d at 1098. Also, if a rule does not represent any substantial departure from the meaning of the underlying regulation, and therefore has no substantial impact of its own, as an interpretative ruling, *Duncan v. Theis*, 613 F.2d 305, 308 (Temp.Em.Ct.App.1979), it is not required to fulfill the notice and comment procedure of the APA.

We agree with the district court that, because the layering rule does not purport to expand or constrict the meaning of the regulation's terms, and because it clarifies the underlying statute or regulation, it is interpretative. Deferring to the agency's interpretation of the rule, and finding substantial evidence to support it, we affirm, "even if alternative conclusions are equally or more reasonable and persuasive." *South Central*

*Term. Co. v. U.S. Dept. of Energy*, 920 F.2d 27, 28 (Temp.Em.Ct.App.1990).

(2) *Proper notice and comment for the layering rule*

■ The district court also found that the DOE fulfilled the notice and comment requirements for promulgation of the rule, despite the fact that interpretative rulings do not require such rigorous procedures.

In this case, the Department of Energy gave a description of what constituted traditional reseller practice in its October 1976 notice. It then gave a specific definition of prohibited "layering" in its August 1977 notice. Finally, it adopted a rule which incorporated almost identical language to that used in the August notice and used the preamble to state that the rule on which it accepted comments was the rule it was promulgating. Plaintiff had plenty of notice and opportunity to comment on the layering rule. The Department clearly met all the requirements imposed by the Federal Energy Administration Act and produced a procedurally valid rule.

*MAPCO*, 783 F.Supp. at 644. MAPCO contends that the court erred in making this determination. First, it insists the DOE never published the actual layering rule as a proposed rule, as the FEAA requires. Second, by considering the definition of layering in the August 1977 Notice Of Proposed Rulemaking [NOPR] as appropriate notice, the court wrongly followed the more flexible notice requirements of the Administrative Procedure Act [APA], which allowed the terms or substance of the proposed rule, or a description of the subjects and issues involved, to count as notice, rather than the stricter FEAA requirement that the rule itself be published. MAPCO argues that this court should follow its prior holding in *Shell Oil v. FEA*, 574 F.2d 512 (Temp.Em.Ct.App.1978), and find that the failure to publish a proposed rule was a failure to comply with the

8. The "normal business practices" rule, 10 C.F.R. § 210.62, provides, in pertinent part:
 Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter....

9. The "anti-circumvention" rule, 10 C.F.R. § 205.202, provides:
 Any practice that circumvents or contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter or any order issued pursuant thereto is a violation of the DOE regulations stated in this chapter.

strict requirements of § 7(i)(1)(B) of the FEAA.

MAPCO correctly notes that, whereas both procedural statutes require the notice of proposed rulemaking to be published in the Federal Register, under the earlier statute, the APA, notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), but under the FEAA the proposed rule itself must be published. *Mobil Oil Corp. v. Dept. of Energy,* 728 F.2d 1477, 1494 (Temp.Em.Ct.App.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984). However, "[n]otice is sufficient if it ' "fairly apprise[s] the interested parties" of the subjects and issues before the Agency,' and thereby 'affords interested parties a reasonable and meaningful opportunity to participate in the rulemaking process.' " *Id.,* citing *McCulloch Gas,* 650 F.2d at 1221.

In this case the August 1977 NOPR reiterated the agency position expressed in its first NOPR, issued October 29, 1976, that "crude oil resellers provide basically a gathering and transportation service." It then proposed amendments and interpretative rulings to the price regulations to clarify that layering practices are not permitted. It explicitly described "layering" as "the insertion of one or more 'resellers' between the producer and refiner and the charging of one or more markups, where the 'layering' firm performs no service or other function traditionally and historically associated with the resale of crude oil." 42 Fed.Reg. 41256, 41262 (Aug. 15, 1977). The agency's statement of commitment that "the price regulations do not permit abuses by crude oil resellers," and its invitation in the NOPR for all interested persons to submit comments on the proposals set forth, persuades us that the notice was sufficient to apprise the public that a layering rule was being considered. Indeed, the agency received 91 written comments from interested parties following the August 1977 NOPR, including nine oral and eight written comments specifically concerning layering. The final rule was published in December 1977, effective January 1, 1978, but the agency provided an additional one-month period for opportunity for comments. It is clear that notice and opportunity for com-

ment were adequate under the requirements of both the APA and the FEAA.

This court has found that the DOE had complied with the procedural requirements of the FEAA, as well as the APA, in *McCulloch Gas,* 650 F.2d at 1223 and n. 11, even though the notice failed to mention certain elements incorporated into the final rule. And in *Mobil,* 728 F.2d at 1495, the court found that a rule promulgated in its first NOPR form, after the second NOPR included modifications of the rule, satisfied the requirements of the APA and FEAA. *See also Exxon v. Dept. of Energy,* 752 F.2d 650 (Temp.Em.Ct.App.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985) (specific formulations of noticed subject matter not required in advance if path of agency is reasonably discernible in the rulemaking).

Courts have overturned an administrative regulation when the agency gave no notice and when there were major substantive differences between the proposed rule and the rule as adopted. *McCulloch,* 650 F.2d at 1221–22. However, MAPCO has not made such showings, and there is no justification in the record for such a claim. The layering provision explained in the second NOPR published in August 1977 provided a clear indication of the contents of the rule and substantially apprised interested parties of the rule. The proposed objective of prohibiting layering, clearly and fully set forth in that NOPR, gave sufficient notice of a forthcoming ruling and allowed interested parties the opportunity to participate in the rulemaking process. *See Mobil Oil,* 728 F.2d at 1490. Thus the FEAA procedural notice and comment requirements of 15 U.S.C. § 766(i)(1)(B) were satisfied.

The *Shell* case, on which MAPCO relies, is not to the contrary. In *Shell,* this court found that an interim rule could not be considered a proposed final rule because it purported to be only a temporary rule and because it "varied too greatly from the [final] regulation to permit comments on the ... interim rule to apply to the ... regulation." *Shell,* 574 F.2d at 517. However, the court admitted that, "where defects in the compliance with procedural requirements do not

defeat the rulemaking process, many courts are unwilling to invalidate the resulting rule." *Id.* at 516. In *Shell,* the rule was invalidated because "the deficiencies in the rulemaking procedures ... were more than technical; they defeated the process." *Id.* MAPCO has alleged a technical deficiency in this case, but has not argued that the rulemaking process was defeated by the agency's failure to publish the exact rule promulgated. We uphold the district court's decision that the layering rule was properly promulgated under the FEAA mandates for notice and comment. *See Shimek v. Dept. of Energy,* 685 F.2d 1372, 1377 (Temp.Em.Ct.App.1981) (published notice of proposed price rule, without specific costs included, provided effective opportunity to comment; rule valid despite lack of opportunity for comment after publication).

### B. *Court Interpretation of the Layering Rule*

■■■ MAPCO claims that in-line transactions of the type challenged by the DOE were a feature common in the industry long before price controls. It argues that the notice adopting the layering rule provided little explanation beyond its intention to prevent layering, and that the first guidance on the rule was given seven years after the rule's adoption in *P & R Trading Co.,* 13 DOE ¶ 83,023 (1985). Furthermore, because the interpretation of the layering rule therein is plainly wrong, insists MAPCO, it is not entitled to deference.

The notice to which MAPCO refers, the August 1977 NOPR, provides more than a statement of intention to prevent layering:

> FEA seeks to ensure that the price regulations do not permit abuses by crude oil resellers. Of particular concern to FEA is the practice commonly known as "layering": the insertion of one or more "resellers" between the producer and refiner and the charging of one or more markups, where the "layering" firm performs no service or function traditionally and historically associated with the resale of crude oil....

42 Fed.Reg. 41256, 41262 (Aug. 15, 1977). This definition of "layering" recognizes that in-line transfers were indeed occurring, as MAPCO stated, but then forbids such practices. Those resellers abusing the price regulations were firms that performed no traditional resale service or function. In *P & R Trading,* a case with facts very similar to those herein, the FERC explained the phrase "service or function traditionally and historically associated with the resale of crude oil" in this way:

> If this phrase in the rule is to have any meaning at all, the reseller must have been engaged in some activity that facilitated the movement of crude oil from the producer to the refiner or provided some other function *of economic benefit* to the crude oil market.

13 DOE at 86,162 (emphasis added). It construed that phrase in the regulation by referring to the plain language of the rule itself, the preamble to the regulation, and the history underlying Subpart L, a method approved by this court in *Wiggins Bros., Inc. v. Dept. of Energy,* 667 F.2d 77 (Temp.Em.Ct. App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982). The DOE has consistently interpreted the phrase "service or other function" to refer to such functions as the gathering, transportation, or storage of crude oil, services in the economy which facilitated the movement of crude oil from the producer to the refinery and therefore were of economic benefit to the industry. This court gives the DOE's interpretation of its regulations "great deference." *Thriftway,* 867 F.2d at 1580.

However, we need not rely solely on *P & R Trading Co.,* and later agency rulings. In the first NOPR of the Subpart L regulations, the "Background" section described gathering, storing and transporting services of resellers as necessary to the movement of crude oil to market:

> Resellers generally purchase crude oil from producers (and occasionally from other resellers) and transport such crude oil by truck and/or pipeline to a delivery point where the crude oil is sold, generally to refiners for processing. Producers of small volumes of crude oil and producers of crude oil at locations which are inconveniently located with respect to delivery

points often are unable to obtain direct access to major pipelines because of the volume or location of the crude oil they produce.... [R]esellers have tended to serve the needs of this segment of the producing industry by accumulating production from a number of small leases so as to be able to market sufficiently large volumes to attract the refiners' buying interest, and by transporting crude oil by truck or other method from leases inaccessible to the pipelines. The purchase and resale of crude oil by such firms appears to be an important historical element in the crude oil distribution chain.

41 Fed.Reg. 47077, 47078 (Oct. 27, 1976). It later explained that reselling in which there was no actual physical possession of the crude oil was a layering violation:

We believe that most resales of crude oil in which a reseller has neither transported nor stored the crude oil in its own facilities do not represent any service or other function traditionally and historically associated with the movement of crude oil from producer to refiner. Therefore, these transactions would appear in most instances to be in contravention of the layering clause in Section 212.186 as well as the normal business practices rule of Section 210.62.

44 Fed.Reg. 62848, 62851 (Oct. 31, 1979) (proposing amendments to Subpart L regulations).

The administrative interpretation is both reasonable and consistent with the language of the layering rule. Therefore the district court's decision to uphold that interpretation was not clearly erroneous. *See Thriftway,* 920 F.2d at 26. Moreover, the economic "gloss" on the layering rule given in *P & R*

*Trading* is completely consonant with the rule and with the agency's commentaries on the rule published by the agency before MAPCO was charged. MAPCO knew or should have known that its activities were not services traditionally and historically associated with the reselling of crude oil.[10]

MAPCO also contends that DOE officials stated that the layering rule was not intended to reach in-line trades like MAPCO's. This argument is without merit. We have consistently held that the unofficial opinions of agency officials "are to be given little weight, as such, unless they are institutional in character." *Pennzoil,* 680 F.2d at 171.

### C. *The Burden of Proof*

MAPCO insists that the DOE did not meet its burden of proving the elements of a layering violation: Its only evidence of MAPCO's violation was its 105 in-line transactions. MAPCO responded by showing that in-line trades were a feature of the industry "traditionally associated with the resale of crude oil," as the regulation requires. However, the OHA held that MAPCO failed to demonstrate that it had "performed a significant, tangible function of economic value to the petroleum industry such as ... gathering, transport or storage of crude oil," the *P & R Trading* standard that was created after MAPCO's filings had been completed. MAPCO argues that the in-line transactions, predating price controls, were "traditional services" of economic value in the industry, and the DOE did not prove otherwise. It contends that the DOE shifted the burden of proof to MAPCO to show that its in-line transfers were not in violation of the layering rule.

---

10. In the memorandum supporting its motion for summary judgment, filed in the district court on November 4, 1991, MAPCO explains the services it performed in its in-line transactions:
a. Bore the risk of loss in taking title and reselling the crude oil involved;
b. Provided an irrevocable bank letter of credit to secure payment for the crude oil;
c. Arranged for transfer of title and transportation of the crude oil with common carrier pipelines and refiners/purchasers;
d. Sold a crude oil supply to resellers, refiners, or reseller affiliates of refiners which would not otherwise have been available;

e. Entered into sales and exchanges of crude oil in order to facilitate the location of crude oil for refiners/purchasers.
R. 8172, quoting Maynard Aff. ¶ 7. These are not traditional functions approved under the regulations. Risk-taking, providing financial services, and the other listed services are not of economic value to the industry. *See P & R Trading,* 13 DOE at 86,165–67. Because MAPCO has not raised these services on appeal or argued that it performed economically valuable services, we need not address these activities.

MAPCO has raised a red herring by claiming the burden of proof was wrongly shifted. There was no shifting; MAPCO simply failed to defend against the government's evidence of MAPCO's overcharge violations. The DOE explained the traditional role of a reseller in its first NOPR; in its second NOPR it condemned the reseller who performed no service or other function traditionally associated with the resale of crude oil. Resellers that inserted themselves between the producer and refiner and charged price markups without performing acceptable services (gathering, storing, transporting crude oil) violated the layering rule as it was clearly described in the notices and the rule itself. MAPCO was just such a firm. As the district court concluded, the fact that MAPCO had so acted in the past is not proof that its activities were not forbidden under the rule.

> Plaintiff wishes to interpret the phrase "traditional and historical" as meaning any activity that has "regularly" occurred in the past. It would be illogical for the Department to write a regulation that would legalize all conduct that had previously occurred when its very purpose was to eliminate prior abusive activities.

*MAPCO*, 783 F.Supp. at 645.

It is undisputed that MAPCO never gathered, transported or arranged for the transport of crude oil, nor did it ever have physical possession of the crude oil. Although MAPCO insists that its activities were "traditionally acceptable," it does not further describe its transactions. Nor does it challenge the district court's depiction of MAPCO's multiple purchases and sales of the same oil.[11] Without some explanation of the purpose or economic value of these multiple resales, MAPCO's burden of proof challenge is without merit.

---

**11.** Indeed, the district court describes one transaction in which "three firms who owned the oil *before* MAPCO bought it owned the oil for a second time *after* MAPCO sold it and before it reached the refinery." 783 F.Supp. at 642 n. 4.

**12.** The "Permissible Average Markup" (PAM) Rule, or General Price Rule, was published in the Final Rule:

### D. *MAPCO's violation of the PAM rule*

In a cursory manner MAPCO contends that the DOE's finding that MAPCO violated the permissible average margin rule [12] was arbitrary and capricious and not supported by substantial evidence. It asserts that the government's requirement that a firm obtain comparable price information *contemporaneously* with the challenged sales "would put resellers in serious jeopardy of criminal prosecution for violation of antitrust laws." MAPCO brief at 21.

The DOE has explained the flaw in MAPCO's much too brief argument at 14 DOE ¶ 83,019 at 86,163–64 and 13 DOE ¶ 84,003 at 87,018–19; we will not repeat it here. We note, however, that the Remedial Order held MAPCO in violation of the PAM or "general price" rule, as well as the normal business practices and anti-circumvention rules, in addition to the layering rule, but all the violations were based on the same transactions that created the overcharges. It suffices for this court to remind MAPCO that its general arguments, offered without bases for the assertions, did not satisfy the agency's requirements of specificity set forth in 10 C.F.R. § 205.196(b). We decline to address this issue further.

### E. *Prejudgment Interest*

The RO issued by the OHA in 1986 required MAPCO to repay $1,992,021.54 in overcharges together with interest from the date of the overcharge to the date of repayment. In its second opinion in this case, the district court held that prejudgment interest must be imposed on the overcharges assessed, calculated at DOE rates. However, in its equitable discretion it tolled part of the interest for periods of administrative delay. *MAPCO*, 791 F.Supp. 315.

Although the plaintiff may not be relieved of its obligation to pay prejudgment

---

> (a) *General.* A reseller may charge any price in a sale of crude oil, provided that the reseller's average markup for each month shall not exceed the reseller's permissible average markup, and provided that a reseller shall not unreasonably discriminate or grant unreasonable preferences in the pricing of crude oil among its purchasers.
>
> 42 Fed.Reg. 64856, 64865 (Dec. 29, 1977), *reprinted at* 10 C.F.R. § 212.183.

interest, the Court is troubled by the unwarranted delay that occurred during the administrative process. MAPCO had a right to contest the overcharges before DOE and before FERC, and it was entitled to receive intermediate decisions from the agencies in a timely fashion.... From the record in this case it appears that FERC took between two and three years to issue a final decision. Since an award of prejudgment interest is made pursuant to the Court's equitable authority, the Court will take into account and disallow interest for any period of time when it believes the prevailing party has not acted as expeditiously as it should have.

791 F.Supp. at 317. The court defined agency "delay":

When an agency takes an undue amount of time to decide a matter submitted to it, the Court believes interest should be tolled during the inordinate length of time used by the agency. There may be some question as to what amount of time constitutes inordinate delay. The Court believes six months should be ample time for an agency to issue a decision. By way of analogy, the Court looks to legislation Congress has recently passed expressing its view on delay resulting from the adjudicative process. See 28 U.S.C. §§ 471–482 (Civil Justice Reform Act). Congress discouraged federal courts from allowing matters to remain pending longer than six months. See 28 U.S.C. § 476. It appears that it would be appropriate to apply the same principle to this case and use a six month standard for the assessment of prejudgment interest in this case. Accordingly, the amount of prejudgment interest owed by the plaintiff will be adjusted for those periods of time when either DOE or FERC took longer than six months to decide a pending matter in this litigation.

Id. On that basis the court disallowed interest for those periods when the agency had taken more than six months to decide a pending matter in the MAPCO case. In all, there were four such periods, involving 39 months in time and $2,076,295 in interest. As a result, the court issued its final judgment in favor of the United States on its counterclaim, in the amount of $5,710,645 (after disallowing the $2 million in prejudgment interest accrued during the delay periods).

The government has appealed. It points out that the MAPCO enforcement proceeding was initiated administratively before the OHA, and then was reviewed and affirmed as a final RO issued by the FERC. In an appeal of an RO, asserts the government, a district court can alter the interest requirement only upon finding that the RO was "in excess of the agency's authority" or "was not supported by substantial evidence." This district court made no such finding. Moreover, there is no statutory authority for tolling the interest due; although in 1986 a statute of limitation was imposed upon the government's ability to *initiate* enforcement actions (*see* 42 U.S.C. § 7101 *et seq.*), there were no time limits established in earlier energy legislation. By tolling a portion of interest on the ground of administrative delay, argues the government, the court exceeded its own authority for reviewing and enforcing DOE orders.

MAPCO, in response, urges this court to uphold the district court's prejudgment interest decision: The award of prejudgment interest is a discretionary one, within a court's equitable powers, and the court had the power to consider the "compelling" reason of administrative delay in its decision.

Fourteen states that were signatories to the final *Stripper Well* settlement agreement controlling the distribution of all crude oil refunds, including MAPCO's, inform the court that the DOE receives the restitutionary funds as trustee for the public, which was overcharged by MAPCO and will receive the funds recovered from MAPCO. Under the refund procedures established, up to 20% of the overcharges will be set aside for refunds to individual applicants who purchased crude oil products, and the remaining 80% will be divided equally between the states and the federal government. The "amici" states will receive 30% of the states' share, and plan to use the refund for energy related programs benefiting energy consumers. They contend that, if the decision below is affirmed, they will be deprived of their share of over $2

million as restitution for the MAPCO overcharges, and the violator of the price control regulations, MAPCO, will receive a windfall.

### (1) *Restitution and prejudgment interest*

■ This court has announced uniformly in its decisions that interest must be included as part of disgorgement in order to achieve restitution. "The court's equitable powers to order restitution permit the court to deprive the wrongdoer of all enrichment obtained at the victim's expense." *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722 (Temp.Em.Ct.App., *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). Because that enrichment includes the benefit of the use of illegally obtained money over the years, the court includes interest from the date of the overcharge as part of the restitution. *U.S. v. Exxon,* 773 F.2d 1240, 1279 (Temp.Em.Ct.App.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986).

TECA has consistently ordered prejudgment interest at the DOE policy rates, and has refused to reduce the interest rate. *See In re Dept. of Energy Stripper Well Exemption Lit. [Oryx Energy Co. v. Dept. of Energy],* 944 F.2d 918, 920 (Temp.Em.Ct. App.1991) (firm's "good faith" belief in legality of its actions not a compelling reason to lower the interest); *In re Dept. of Energy Stripper Well Exemption Lit. [Chevron U.S.A., Inc. v. Dept. of Energy],* 944 F.2d 914, 916 (Temp.Em.Ct.App.1991) (interest not measured by firm's own borrowing costs, but by DOE rates); *Citronelle–Mobile Gathering, Inc. v. Herrington,* 826 F.2d 16, 30 (Temp.Em.Ct.App.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987) (rejecting state law rate; DOE rate more realistically reflects full value of money retained). *But see Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* 712 F.2d 1402 (Temp. Em.Ct.App.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983).

■ While recognizing that "restitution should make victims whole, unless some compelling reason counsels otherwise," *Herrington,* 826 F.2d at 28, TECA has nevertheless without deviation declined to reduce interest because of administrative delay. In *U.S. v. Ladd Petroleum Corp.,* 843 F.2d 506 (Temp.Em.Ct.App.1988), this court overturned the district court's decision not to require interest for the four-year delay between the DOE's NOPR and its filing of suit in district court. In *Lea Exploration, Inc. v. Dept. of Energy,* 843 F.2d 510 (Temp.Em.Ct.App.1988), it reversed a decision to deny interest for the delay between the time Lea filed its property reports and the time the government notified it of the potential violation. *See also Citronelle–Mobile,* 826 F.2d at 29–30 (interest imposed despite four-year lapse before government decided the transactions were illegal). Just as we did not find those delays to be compelling reasons for refusing to apply full prejudgment interest, so too in this case we believe that administrative delay does not warrant a reduction in the amount of prejudgment interest charged to the wrongdoer.

### (2) *Judicial review of imposition of prejudgment interest*

The procedural stance of MAPCO's appeal establishes the standard and scope by which a court conducts its review of the final agency decision. Before the district court was MAPCO's complaint seeking a reversal of the RO as arbitrary and capricious.[13]

■ When determining whether to enforce the FERC's remedial order against MAPCO, our examination of the administrative record is an independent one. *Pratt v. Watkins,* 946 F.2d at 909. However, we can reverse the RO only if it is "in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." *Id.,* citing Economic Stabilization Act [ESA] of 1970, § 211(d)(1), 12 U.S.C.A. § 1904 note (West 1991).[14] The question in this case is whether the court is confined to

---

**13.** MAPCO's first count of its complaint, seeking that the court compel FERC to declare the layering rule invalid, became moot when the FERC issued its final Remedial Order.

**14.** Sections 209 and 211(d)(1) of the Economic Stabilization Act of 1970 are found in the Economic Stabilization Act Amendments of 1971, § 2, Pub.L. No. 92–210, 1971 U.S.C.C.A.N. (85 Stat. 743) 837.

that standard when considering the award of prejudgment interest. We hold that it is.

■ A district court regularly uses its equitable powers to fashion the proper restitutionary relief when the government seeks restitution for overcharges under ESA § 209 by commencing its action in district court. The trial judge has some discretion in determining the prejudgment interest award, and the appellate court reviews that decision for an abuse of discretion. *Lea Exploration,* 843 F.2d at 512–13. If the final order has been issued by the agency, however, judicial review of administrative orders is governed by ESA § 211(d), which mandates a finding that the order "is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence" before it can be set aside. *Thriftway,* 920 F.2d at 25. In this case the district court did not make such a finding or consider the agency's expertise, to which it should have given deference.

■ An award of prejudgment interest in an RO is certainly not in excess of the agency's authority. As discussed above, caselaw from this court consistently allows a full restitutionary award to restore the status quo, and assesses prejudgment interest at the market rate. *Herrington,* 826 F.2d at 29–30. Nothing in the record before us allows us to deviate from that position. The order was not based upon findings that were not supported by substantial evidence; MAPCO has not so alleged, and our review of the record does not so find. Therefore we hold that the Remedial Order must be upheld in its entirety. We further hold that, by exercising its equitable discretion concerning application of prejudgment interest rates, the district court exceeded its authority. For that reason we affirm the district court's imposition of prejudgment interest but reverse the court's decision to disallow certain prejudgment interest amounts, and order that the district court modify its order to encompass the full restitutionary award of prejudgment interest.

## IV. CONCLUSION

After a complete review of the record herein, this court is satisfied that there was a rational basis for the final Remedial Order issued by the FERC, and that the RO was not based upon findings not supported by substantial evidence. Therefore the district court's affirmance of the administrative final order is AFFIRMED. Also, the district court's award of prejudgment interest at the standard DOE schedule rate to the defendant is AFFIRMED. However, the district court's decision to disallow some prejudgment interest is REVERSED, with instructions that the prejudgment interest accruing from the date of the overcharge violation to the date of repayment be assessed as charged in the Remedial Order.

The mandate of the Court will issue forthwith. Any petition for rehearing shall be filed with the Clerk of the U.S. Court of Appeals for the Federal Circuit within the time permitted by the rules.