**In re The DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**W.R. MURFIN d/b/a Murfin Drilling Company, Plaintiff,**

**and**

**Union Pacific Resources Company, formerly Champlin Petroleum Company, Plaintiff–Appellant,**

**v.**

**UNITED STATES DEPARTMENT OF ENERGY and Hazel R. O'Leary, Secretary of Energy, Defendants–Appellees.**

**No. 95–1398.**

United States Court of Appeals, Federal Circuit.

July 18, 1996.

Donald B. Craven, Miller & Chevalier, Chartered, Washington, DC, argued for plaintiff-appellant. With him on the brief were James P. Tuite and Lisa T. Murphy. Also on the brief was Dennis M. Feeney, Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, Kansas.

Edward P. Levy, Office of General Counsel, Department of Energy, Washington, DC, argued for defendants-appellees. With him on the brief were Don W. Crockett and Paul T. Michael. Also on the brief were Frank W. Hunger, Assistant Attorney General and

Bruce G. Forrest, Appellate Staff, Civil Division, Department of Justice, Washington, DC.

James Baller, The Baller Law Group, P.C., Washington, DC, for amicus curiae. With him on the brief was Lana L. Meller.

Before NEWMAN, SCHALL and BRYSON, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Union Pacific Resources Company (UPRC) appeals the decision of the United States District Court for the District of Kansas granting summary judgment in favor of the Department of Energy (DOE).[1] The district court required that UPRC refund certain overcharges on the sale of oil from the Arch Unit in Sweetwater County, Wyoming. The overcharges occurred when Coastal States Oil & Gas Company (now The Coastal Corporation) and Sun Oil Company (now Oryx Energy Company) charged uncontrolled prices, relying on an injunction that was later vacated. The district court held that UPRC was responsible for the overcharges under the operator liability doctrine, on the ground that UPRC had "caused" Coastal and Sun, working interest owners who took and sold their share of the oil, to rely on the injunction and charge the uncontrolled prices.

We conclude that UPRC did not cause and is not liable for the overcharges on oil produced from the Arch Unit and sold by Coastal and Sun. The district court incorrectly held UPRC liable under the operator liability doctrine; that decision is reversed. However, we affirm the denial of UPRC's request for refund of an escrow account overpayment under the Final Settlement Agreement.

## BACKGROUND

### A. THE STRIPPER WELL PREMIUM

From 1973 to 1981 the federal government regulated the sale of crude oil by setting maximum allowable prices. However, oil produced from stripper wells was exempt from these price controls. Stripper wells were defined as wells that produced an average of less than ten barrels per well per day.

The number of wells in the producing unit were counted to determine the average production per well. At the start of the price control procedures in 1973, the well count included the injection wells that were situated within the boundaries of the lease area. Injection wells are used to inject materials into reservoirs to boost oil production, but do not themselves produce oil. By including the injection wells in the well count, certain leases were exempted from price controls that would not have been exempt if the injection wells were not counted.

At the end of 1974 the Federal Energy Administration (predecessor agency to the DOE) issued Ruling 1974–29 declaring that injection wells could not be counted for the purpose of determining entitlement to the stripper well exemption. Several oil producers challenged Ruling 1974–29, on various grounds. The United States District Court for the District of Kansas held that the Ruling was procedurally invalid under the Administrative Procedure Act, and enjoined its enforcement. *Energy Reserves Group, Inc. v. Federal Energy Admin.*, 447 F.Supp. 1135, 1151 (D.Kan.1978). The district court held that pending disposition of the appeal to the Temporary Emergency Court of Appeals, the producers could continue to charge the uncontrolled stripper well price in reliance on the injunction, provided that they deposited the stripper price premium into an escrow account with the clerk of the district court.

Despite this decision the government announced that it would enforce DOE Ruling 1974–29 against all oil producers who were not parties to the Kansas action. Thus any other producer was obliged to bring a separate action and obtain a separate injunction barring enforcement against it of Ruling 1974–29 subject to an escrow deposit of the stripper well price premium. Each of the producers in this case—UPRC, Coastal, and Sun—obtained such an injunction. In July 1979 all of the cases in which injunctions and escrow orders had been entered were consolidated by the Judicial Panel on Multidistrict Litigation and were assigned to the Kansas district court as M.D.L. 378.

---

1. *In re Department of Energy Stripper Well Exemption Litig.*, 880 F.Supp. 1466 (D.Kan.1995).

After certain intervening actions the issue of the validity of Ruling 1974–29 was finally decided in 1982. The Temporary Emergency Court of Appeals reversed the Kansas district court and upheld the validity of the ruling and its prohibition on counting injection wells. *In re Department of Energy Stripper Well Exemption Litig.*, 690 F.2d 1375 (Temp.Emer.Ct.App.1982), *cert. denied*, 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). On remand the Kansas district court treated the matter as a government enforcement action under § 209 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, whereby the fact of overcharge was deemed determined and the issue was restitution of the escrowed funds to those who had been overcharged. *In re Department of Energy Stripper Well Exemption Litig.*, 578 F.Supp. 586, 593 (D.Kan.1983).

On July 7, 1986 all of the parties to the multidistrict litigation and the DOE entered into a Final Settlement Agreement governing the distribution of the escrowed funds and reserving for later determination by audit the question of whether any producer owed additional sums. Thereafter the government filed a claim against UPRC, seeking to recover from UPRC the stripper premium due to sales by Coastal and Sun of oil taken from the Arch Unit, on the theory that UPRC is liable for the Coastal and Sun overcharges because UPRC was the operator of the Arch Unit. This claim is the primary subject of this appeal.

## B. THE ARCH UNIT OPERATION

Typically, one of the owners of a working interest in an oil lease serves as the operator of the entire lease. During the relevant time period (1978–1981) Champlin Petroleum Company, UPRC's predecessor, operated the Arch Unit. In accordance with the operating agreement Champlin oversaw the drilling activities, maintained the books and records, and paid state taxes and royalties on behalf of the other working interest owners. Champlin was reimbursed for these expenditures.

The Arch Unit Operating Agreement authorized each working interest owner to "take in kind its participating percentage of all unitized substances produced from Unit wells" and "separately dispose of its share of such production." Both Coastal and Sun took their percentages in kind, and also took and marketed the shares of certain minor working interest owners. UPRC did not participate in the pricing or sale of this oil, nor did UPRC receive any proceeds of these sales. Sun's sales were about 40% of the Unit's production and Coastal's sales were about 12%. UPRC sold about 46% of the production. The remaining 2% was taken in kind and sold by other working interest owners, and is not at issue.

At the time when the district court barred enforcement of Ruling 1974–29, UPRC determined that if the injection wells were counted the Arch Unit averaged daily production of 7.54 barrels per well and thus qualified for the stripper well exemption. On March 23, 1978 UPRC sent a "certification letter" to Amoco Oil Company, purchaser of UPRC's 46% share of the Arch Unit production, stating that "the captioned property qualifies as stripper well property." On March 27, 1978 UPRC sent copies of this letter to Coastal and to Sun, with a letter stating that because of the "complex" legal questions involved Coastal and Sun should "consult your own counsel" about whether to rely on the injunction and count the injection wells.

The district court found that before UPRC sent Sun a copy of its letter to Amoco, Sun had decided, "[a]s a matter of company policy," to count the injection wells. *In re DOE Stripper Litig.*, 880 F.Supp. at 1475. Sun had obtained its own injunction protecting it against enforcement of Ruling 1974–29 with respect to the pricing of oil from the Arch Unit and similar properties. *Id.* at 1476. On March 9, 1978 Sun certified thirty-one properties as stripper well properties. On March 27, 1978 Sun certified to The Permian Corporation, purchaser from Sun of Arch Unit oil, that "production from the Arch Unit qualified for exempt stripper pricing." *Id.* at 1475. Sun made escrow deposits of the stripper premium received on sales of oil taken from the Arch Unit. *Id.* at 1476. The government litigated with Sun as to all issues arising from Sun's transactions and operations, and in addition to the amounts in es-

crow the government recovered thirty million dollars. *Id.*

Coastal also obtained its own injunction with respect to Ruling 1974–29, and also decided as a matter of "general company policy" to rely on the injunction and to "certify properties as stripper based on counting injection wells." 880 F.Supp. at 1477. On March 31, 1978 Coastal, through its subsidiary Gas Producing Enterprises, issued a certification to Phillips Petroleum Company, the purchaser of Coastal's Arch Unit oil, stating that the property qualified for the stripper well exemption. Coastal made no escrow deposits of the Arch Unit stripper premium. However, after the validity of Ruling 1974–29 was upheld on appeal, Coastal executed a settlement with DOE of all disputed issues. In accordance with that settlement Coastal paid to DOE the sum of $215,000, agreed to an audit to verify that no more was owed, and with DOE stipulated to dismissal of Coastal's suit. *Id.* at 1478.

DOE now seeks recovery from UPRC of asserted deficiencies in the sums that Coastal and Sun are said to owe on oil from the Arch Unit, based on UPRC's role as operator of the Unit. DOE argues that UPRC is liable for these deficiencies whether or not the final dispositions against Sun and Coastal included payments for overcharges at the Arch Unit. In granting summary judgment against UPRC, the district court stated that "the operator of a crude oil producing property" may be held "liable for overcharges attributable to other interest owners on that property." 880 F.Supp. at 1480. UPRC on appeal argues that all of its obligations are fully satisfied concerning Arch Unit oil sold at stripper well exemption prices, and that the "operator liability doctrine" was incorrectly applied.

■ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liber-*

*ty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The grant of summary judgment is subject to plenary review on appeal. *MAPCO Int'l Inc. v. Federal Energy Regulatory Comm'n,* 993 F.2d 235, 239 (Temp.Emer.Ct.App.1993).

I

## UPRC'S LIABILITY AS OPERATOR

The principal issue is whether the operator liability doctrine was correctly applied to require UPRC to reimburse overcharges by Coastal and Sun on oil taken from the Arch Unit, independent of any settlement and payment made by Coastal and Sun.

■ The operator liability doctrine permits the DOE to hold an operator liable for the full amount of any overcharges attributable to sales from a particular property without regard to whether the operator itself received the overcharges. The district court explained: "Operator liability has been imposed in at least two general situations: when the operator is the animating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience." 880 F.Supp. at 1480. *See In re Department of Energy Stripper Well Exemption Litig.,* 968 F.2d 27, 33 (Temp.Emer.Ct.App.1992) (the doctrine is devised "primarily for the administrative convenience of the Department of Energy"); *United States v. Exxon Corp.,* 561 F.Supp. 816, 850 (D.D.C.1983) (requiring the Department of Energy to proceed against over 200 working interest owners and over 2200 royalty interest owners would plunge the agency into an "administrative quagmire"), *aff'd,* 773 F.2d 1240 (Temp.Emer.Ct.App.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 893, 88 L.Ed.2d 926 (1986). The operator liability "doctrine" is not a legal rule of absolute liability. It is a discretionary judicial resource, invoked in appropriate circumstances. *See Sauder v. Department of Energy,* 648 F.2d 1341, 1347–48 (Temp. Emer. Ct. App. 1981) (application of the operator liability doctrine is discretionary).

The district court did not rely on administrative convenience in this case; indeed,

DOE could readily have sought recovery from Coastal and Sun rather than UPRC, and was in negotiation and litigation with both Coastal and Sun. The sole basis for imposing operator liability on UPRC was that it was the "animating force" behind the overcharges. The district court relied on *Sauder*, 648 F.2d at 1347–48, wherein the operator was held liable for having caused the overcharges. In *Sauder* the operator had the largest single holding, sold all of the oil on behalf of the other owners, and certified to the sole purchaser that the oil qualified for the exemption. The Temporary Emergency Court of Appeals held that "it was [Sauder] who caused the overcharges." *Id.* at 1347. Thus the operator was held liable for the entire stripper premium, although the profits had been disbursed to all the interest owners.

The government also relies on the holding of the Temporary Emergency Court of Appeals in *United States v. Exxon*, 773 F.2d 1240 (Temp.Emer.Ct.App.1985). Exxon as unit operator had improperly calculated, under the regulations, the amount of "old" oil and "new" oil (for which a higher price could be charged) produced from the Hawkins Field Unit. Exxon's working interest was about two thirds, but Exxon was held liable for all overcharges resulting from this miscalculation, including those on the oil (5%) that was taken in kind by Texaco and sold to third parties. The court referred to Exxon's domination of the unit's operations and its effective control over the actions leading to the violations. The court stressed that the non-Exxon interests were spread over "more than 200 working interest owners, and 2200 royalty interest owners," 773 F.2d at 1270, and that Exxon " 'decided how the unit would account for upper and lower tier oil.' " *Id.* (quoting *Exxon*, 561 F.Supp. at 849). With respect to Exxon's liability for the 5% of the production that was taken in kind and sold by Texaco, the court explained that Texaco had previously properly calculated the amounts of new and old oil, but had acquiesced, under threat of suit by royalty owners, in accepting Exxon's calculation. Thus Exxon was held liable for Texaco's overcharges. The district court applied *Exxon* in holding UPRC liable as the operator,

finding that UPRC "caused" the overcharges by Sun and Coastal.

DOE contends that UPRC caused the overcharges when it sent to Sun and Coastal a copy of UPRC's statement to Amoco that the Arch Unit qualified for stripper well pricing. UPRC responds that Sun and Coastal independently decided to charge the stripper price for Arch Unit oil, and that UPRC did not cause their overcharges. The evidence was undisputed that Sun and Coastal made independent decisions, starting before they were advised of UPRC's position. Sun and Coastal made stripper well decisions with respect to properties in addition to the Arch Unit, and each took independent legal action to obtain the requisite injunction concerning Ruling 1974–29.

Unlike the facts of *Exxon* or *Sauder*, Sun and Coastal each held a substantial interest, and both Sun and Coastal made independent decisions to charge the stripper well premium. UPRC had provided Coastal and Sun with its conclusions based on the production information that UPRC as operator was required to provide to the working interest owners. Sun and Coastal used the information to implement their independently-made pricing decisions. The district court observed that "UPRC advised the interest owners to make their own decisions regarding the collection of stripper prices." 880 F.Supp. at 1483.

■ Neither statute nor precedent creates a *per se* operator liability for any operator that provides a working interest owner with information concerning stripper status. An operator can not be held to have "caused" the overcharges unless the operator's actions and representations led directly to the overcharges, *see Sauder*, or at least unless the other working interest owners acquiesced in or yielded to the operator's actions and proposals. *See Exxon*. In *Sauder* the court explained that the operator liability doctrine is not intended to provide "carte blanche" for DOE to hold operators liable. 648 F.2d at 1349.

Concerning Sun, the district court found that before UPRC advised Sun of its certification to Amoco in its letter of March 27,

1978, on March 3, 1978 Sun had " 'decided to begin counting injection wells and to hold the resulting additional revenues in suspense pending appeal.' " 880 F.Supp. at 1475 (citation omitted). The court recognized that Sun made a policy decision to count injection wells, and used the information provided by UPRC to determine that if injection wells were counted the Arch Unit oil would qualify for the stripper well exemption. The elements of causation and undue influence are absent. The district court thus erred in holding UPRC liable for Sun's overcharges.

Concerning Coastal, the district court found that shortly after Ruling 1974–29 was held invalid "Coastal began counting injection wells and charging the stripper premium. That decision was not made on an individual property basis but was instead a decision of general company policy applicable to all of Coastal's interests in crude oil producing properties." 880 F.Supp. at 1477. Again, causation and undue influence by UPRC were not shown.

■ Sun and Coastal, not UPRC, each decided to charge stripper well prices for their oil from the Arch Unit. In order to do so, each obtained its own injunction, issued its own certification, and negotiated prices with its own purchasers. DOE does not dispute that UPRC did not participate in these actions. Thus the district court clearly erred in finding that UPRC caused Sun and Coastal to charge the stripper well prices. The holding of liability is reversed.[2]

## II

### THE ESCROW OVERPAYMENT

UPRC seeks return of approximately $390,000 that it erroneously paid the government in September 1993 when UPRC misapplied DOE's method of computing escrow deposits. DOE concedes that the $390,000 payment was in error, but argues that UPRC must be denied recovery because a refund would violate the terms of the Final Settlement Agreement between DOE and UPRC.

The district court agreed with the government.

The escrow deposits were disbursed in December 1993 in accordance with the terms of the Final Settlement Agreement. UPRC discovered the error and in March 1994 moved the district court for relief in the event that it succeeded on this appeal. The district court characterized UPRC's motion as "moot" in view of its ruling upholding UPRC's operator liability, but also declared that in any event it could not remedy the error because "the Final Settlement Agreement bars the withdrawal of any funds by UPRC once paid in and disbursed." 880 F.Supp. at 1486.

The relevant clause in the Final Settlement Agreement provides that a party may seek refund of an amount "in excess of that Party's actual liability so long as such funds remain undistributed from such escrow or such claim is asserted as an offset to a claim that additional monies should be paid into such escrow." DOE states that this means that a claim to recover an overpayment into the escrow account can be made only before the disbursement of the specific overpaid monies, and that thereafter any erroneous overpayment can be offset only against any additional sums owed. DOE points out that there are no additional sums owed and available for offset.

■ UPRC does not challenge the validity of the provision of the Final Settlement Agreement that bars refund of an escrow overpayment after disbursement. UPRC's erroneous payment in September 1993 was disbursed in December 1993. In the absence of other liability against which the overpayment may be offset, the requested refund must be denied. *Cf. M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972) (absent a compelling reason, contract term reached after "an arm's-length negotiation by experienced and sophisticated businessmen," should be enforced by the courts).

---

**2.** In view of this decision, we do not reach the issue of the effect of the final dispositions be-

tween the government and Sun and Coastal.

SUMMARY

UPRC is not liable for overcharges on the Arch Unit oil sold by Sun and Coastal at stripper well premium prices. The judgment to that effect is reversed. The district court's denial of UPRC's request for refund of its September 1993 overpayment is affirmed.

*AFFIRMED IN PART AND REVERSED IN PART.*